United States District Court
Southern District of Texas
**ENTERED**
June 30, 2025
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| GUILLERMO SAN MIGUEL MARTINEZ, *et al.*, | § § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. 7:23-CV-00388 |
| HIDALGO COUNTY, *et al.*, | § § § | |
| Defendants. | § | |

## ORDER GRANTING DEFENDANTS' MOTION FOR FINAL SUMMARY JUDGMENT

### I.     Background

Now before the Court is Defendants' Motion for Final Summary Judgment.  (Dkt. No. 34).[1]

This wrongful death and survival action, filed in state court and removed here on federal question

grounds, arises from a tragic incident when two county sheriff's deputies responded to a domestic

dispute at the residence of a mother and her adult son.  The deputies breached the door to the

residence while the mother waited outside and encountered the son in his bedroom, holding a knife.

As the son emerged from his room, still holding the knife, the deputies shot and killed him.

Plaintiffs Guillermo San Miguel Martinez and Maura Sanchez (Maura), individually and as

representatives of the estate of Guillermo San Miguel Sanchez (Guillermo), decedent, assert claims

under 42 U.S.C. § 1983 against Defendants Hidalgo County and Bryan Ayala (Ayala) and Juan

Flores (Flores), individually and in their official capacities as County Sheriff's Deputies

(collectively, Deputies), for depriving Guillermo of his Fourth Amendment rights to be free from

---

[1]  The Court's order granting this Motion renders moot various additional motions subsequently filed and not affecting the issues raised here.  *See* (Dkt. Nos. 40, 45, 47, 49, 55).

1 / 22

warrantless entry and arrest and from excessive force. (Dkt. No. 1-21).[2] Plaintiffs also seek to hold the County liable under the Texas Tort Claims Act (TTCA) for the alleged negligent use of the guns and bullets that killed Guillermo. (*Id.*). After removal of the action, the Court slightly narrowed the § 1983 claims by granting the Deputies' partial motion to dismiss the request by Plaintiffs individually to recover punitive damages through their wrongful death claims against these Defendants. (Dkt. No. 23).[3] Now, all Defendants seek summary judgment on Plaintiffs' TTCA and § 1983 claims in their entirety, on the following grounds: (1) the County has not waived its immunity to suit under the TTCA; (2) the Deputies in their individual capacities have qualified immunity to suit under § 1983; and (3) in the absence of a constitutional violation, Plaintiffs have no § 1983 claim against the Deputies in their official capacities/the County. (Dkt. No. 34). Upon consideration of the Motion, the parties' responsive briefing,[4] and the summary judgment evidence,[5] in light of the relevant law, the Court accepts the asserted bases for summary judgment and must grant the Motion.

## II.     Standard of Review

A district court must grant summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A fact is material if it might affect the outcome of the lawsuit under the governing law, and is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party moving for summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those

---

[2] On May 28, 2025, Plaintiffs filed a suggestion of death representing that Maura passed away on or about January 20, 2024, during the pendency of the action. (Dkt. No. 50).

[3] Otherwise, the Court denied the County's and the Deputies' attempts to narrow the § 1983 claims by denying their partial motions to dismiss Plaintiffs' survivorship claims (including the request for punitive damages) brought in their representative capacities. (Dkt. No. 23). The County did not move to dismiss the TTCA claim against it.

[4] (Dkt. Nos. 37, 38, 39-2, 41).

[5] (Dkt. No. 34, Exhs. 1-8; Dkt. No. 37, Exhs. 1-12; Dkt. No. 39, Exhs. 13-16).

portions of the pleadings and materials in the record, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56(a), (c). Once the moving party carries its burden, the burden shifts to the nonmovant to go beyond the pleadings and provide specific facts showing the existence of a genuine issue for trial. *Celotex*, 477 U.S. at 324; FED. R. CIV. P. 56(c). In conducting its review of the summary judgment record, the court "may not make credibility determinations or weigh the evidence" and must resolve doubts and reasonable inferences regarding the facts in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255; *Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006). However, the nonmovant cannot satisfy its burden with "conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence." *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010); *see also Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment.").

## III.    TTCA Claim against the County[6]

Plaintiffs' Second Amended Petition, their live pleading, invokes the TTCA as the vehicle through which they seek to hold the County liable for negligence. (Dkt. No. 1-21 at § V(C)). Texas governmental units, such as the County, enjoy sovereign immunity from tort liability absent waiver of immunity, which the TTCA accomplishes by subjecting governmental units to liability for "personal injury and death so caused by a condition or use of tangible personal…property if

---

[6] The Motion also requests summary judgment on any state-law claims brought against the Deputies, but since Plaintiffs plead their TTCA claim against the County only, and Plaintiffs' response to the Motion represents that they have no state-law claims pending against the Deputies, these Defendants have now withdrawn this request. *See* (Dkt. No. 1-21 at § V(C); Dkt. No. 34 at ¶ 2 n.1, § II; Dkt. No. 37 at pp. 22-23; Dkt. No. 38 at ¶ 1 n.1).

the governmental unit would, were it a private person, be liable to the claimant according to Texas law." (Dkt. No. 34 at ¶ 3); *Dallas Cnty. Mental Health & Mental Retardation v. Bossley*, 968 S.W.2d 339, 341-42 (Tex. 1998); TEX. CIV. PRAC. & REM. CODE § 101.021(2). Plaintiffs attempt to plead into this limited waiver of immunity by alleging that the County's authorization of its Deputies' use of the tangible personal property it furnished to them, i.e., guns and bullets, to kill Guillermo, amounts to actionable negligence. *See* (Dkt. No. 1-21 at § V(C)). The County, in return, submits that the established facts of this case invoke another TTCA provision—its exception to waiver for any claim "arising out of assault, battery, false imprisonment, or any other intentional tort"—and moves for summary judgment on the ground that it retains its immunity. (Dkt. No. 34 at ¶ 4); TEX. CIV. PRAC. & REM. CODE § 101.057(2). Though acknowledging the intentional tort exception to waiver, Plaintiffs argue against its application on the asserted basis that "[w]hether Deputies Ayala and Flores in this matter acted intentionally or negligently is a question of fact as to their mental culpability and therefore only appropriately determined by the trier of the fact after hearing all the evidence." (Dkt. No. 37 at p. 23). But since the record contains no evidence that the Deputies discharged their weapons by accident or mistake—in fact, they admit they did so intentionally, in response to the ostensible threat posed by Guillermo[7]—no such fact question remains. *See* (Dkt. No. 34 at ¶¶ 5-7; Dkt. No. 38 at ¶ 2); *e.g.*, *Pineda v. City of Houston*, 175 S.W.3d 276 (Tex. App.-Houston [1st Dist.] 2004, no pet.) (where case did not involve "an accidental shooting, such as the inadvertent discharge of the pistol"—rather, officers intended to shoot decedent "because they believed, albeit incorrectly, that he was armed and dangerous"— intentional tort exception applied to preserve city's immunity); *Harris v. Bosque Cnty., Tex.*, 2015 WL 13298190, at *3-4 (W. D. Tex. Aug. 28, 2015) (although plaintiff maintained that decedent

---

[7] *See* (Dkt. No. 34, Exh. 1 at pp. 84, 106-07; Exh. 5 at pp. 48-49). Consistent with this evidence, an earlier section of Plaintiffs' response acknowledges that the Deputies "intentionally, knowingly, and purposely discharged their weapons." (Dkt. No. 37 at p. 17; Dkt. No. 38 at ¶ 1 n.2).

shot by officer posed no imminent threat of danger warranting deadly force, shooting was intentional act by officer falling within exception to county's waiver of immunity). Though pleaded as a claim of negligence, Plaintiffs' TTCA claim arises out of an intentional tort and is barred, and summary judgment must be granted. *See Pineda*, 175 S.W.3d at 282-83 ("A plaintiff cannot circumvent the intentional tort exception by couching his claims in terms of negligence.") (citing cases).

## IV.    § 1983 Claims

### A.    Overview

Plaintiffs' remaining claims invoke § 1983, which provides a claim against any "person" who, "under color of any statute, ordinance, regulation, custom, or usage, of any State," violates another's rights under the U.S. Constitution. 42 U.S.C. § 1983. A plaintiff may bring a § 1983 claim against a person in his individual or official capacity, or against a local government entity. *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (municipalities and other local government units are "persons" subject to suit under § 1983). A § 1983 suit against a person in his official capacity is a suit against his office and is no different from a suit against the entity itself. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985); *Monell*, 436 U.S. at 690 n.55). Here, Plaintiffs have sued Deputies Ayala and Flores in their individual and official capacities, as well as the County, for violations of Guillermo's Fourth Amendment right to be free from unreasonable searches and seizures, i.e., the alleged warrantless entry into the home and the arrest of Guillermo, and the use of excessive force against him. (Dkt. No. 1-21 at § V(D)-(F)); *see* U.S. CONST. amend. IV.

**B.      Individual Capacity Claims**

**1.      Qualified Immunity**

The Motion first targets Plaintiffs' § 1983 claims asserted against Deputies Ayala and Flores in their individual capacities, arguing that these Defendants are entitled to qualified immunity.  (Dkt. No. 34 at § III).  "Qualified immunity protects governmental officials from liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *E.g.*, *Carroll v. Ellington*, 800 F.3d 154, 169 (5th Cir. 2015) (quoting *Rockwell v. Brown,* 664 F.3d 985, 990 (5th Cir. 2011)).  "When a defendant invokes qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense."  *Id.* (quoting *Club Retro, L.L.C. v. Hilton,* 568 F.3d 181, 194 (5th Cir. 2009)).  To evaluate a government official's entitlement to immunity, courts conduct a two-prong inquiry, asking "(1) whether the undisputed facts and the disputed facts, accepting the plaintiffs' version of the disputed facts as true, constitute a violation of a constitutional right, and (2) whether the defendant's conduct was 'objectively reasonable in light of clearly established law.'"  *Id.* (quoting *Thompson v. Upshur Cnty., Tex.,* 245 F.3d 447, 457 (5th Cir. 2001)).  Courts "have discretion to address either prong first without necessarily addressing the other."  *Id.*  Defendants' Motion addresses both in tandem, but for the reasons explained *infra*, the first proves dispositive because the record does not support the existence of a constitutional violation.  Therefore, the Court need not address whether, even if a constitutional violation occurred, the Deputies acted reasonably under the law as established at the time.

**2.      Warrantless Entry and Arrest**

In pleading a claim for warrantless entry and arrest against the Deputies, Plaintiffs cite to the "'basic principle of Fourth Amendment law' that searches and seizures inside a home without

6 / 22

a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477 (1971)); (Dkt. No. 1-21 at § V(E), (F)). It is undisputed that the Deputies had no warrant; however, they appeal to two well-established exceptions to the presumption against unreasonableness, the first of which holds that "police may conduct a warrantless search of an area without running afoul of the Fourth Amendment if a third party with common control over the area consents to the search." (Dkt. No. 34 at ¶ 12); *Harris v. Serpas*, 745 F.3d 767, 773 (5th Cir. 2014) (quoting *United States v. Solis*, 299 F.3d 420, 436 (5th Cir. 2002)).[8] Relying on Ayala's deposition testimony and written statement of the incident, the Deputies submit that Guillermo's mother, Maura, "was an occupant of the subject home and she consented to [the Deputies'] entry"; therefore, no constitutional violation occurred. (Dkt. No. 34 at ¶ 12; *see* Exh. 1 at p. 175, Exh. 2).[9] According to Ayala's statement, he and Flores arrived at the home at issue to conduct a welfare check, after a neighbor reported seeing a mother and son fighting in the front yard. (*Id.*, Exh. 2). When Ayala arrived, an elderly woman Flores identified as the mother, Maura, was standing outside with visible injuries to her face, while the son, Guillermo, had entered the home and locked the doors. *Id.* Ayala asked Maura for permission to force the door open, but she declined, explaining that her daughter was coming to the house to open the door. *Id.* Ayala walked towards the back of the house, stopping at Guillermo's bedroom window where he called out to Guillermo but heard no response, then continued walking. *Id.* As Ayala reached the rear corner of the house, he heard Guillermo's bedroom window "shatter from the inside out" and "could hear other things being broken from inside the bedroom." *Id.* At that point, "[b]ecause of what Guillermo did to his mother, and the injuries she clearly sustained," and "to stop him from causing more damage to her home," Ayala decided to enter the house to arrest

---

[8] The second is the "exigent circumstances" exception, which the Court need not reach. (Dkt. No. 34 at ¶ 13); *see Hogan v. Cunningham*, 722 F.3d 725, 731 (5th Cir. 2013).
[9] The Deputies also submit Ayala's affidavit attesting to the truth the facts contained in his written statement made shortly after the incident. (Dkt. No. 34, Exh. 3).

Guillermo for "assault family violence." *Id.* As both Deputies approached the front door, Maura yelled, in Spanish, to "break down the door,"[10] upon which Flores used his shoulder to force the door open and the Deputies entered the home. *Id.*

Plaintiffs' response, though not contesting that Maura had the right to consent to entry,[11] denies that she ever gave it, relying on the statements of a friend and daughter-in-law both present on the scene, and on Ayala's body camera video and audio. (Dkt. No. 37 at pp. 5-8; *see* Exhs. 3, 6-8). Georgina Turrubiartes, who identifies herself as Maura's longtime friend, and Ana Cecilia Rangel, Maura's daughter-in-law, provide substantively identical affidavits stating that they stood outside the home with Maura from the time of the Deputies' arrival until their forced entry. (*Id.*, Exhs. 6, 7). According to both affiants, Maura told the Deputies that "her daughter was on the way with the key to the home and…could calm [Guillermo] down," as her daughter had done in the past, but the Deputies broke down the front door and entered the home before Maura's daughter arrived and without Maura's consent. *Id.* Ms. Turrubiartes's written statement following the incident, as recorded by a County Sheriff's investigator, provides the following, additional details:

> [Ms. Turrubiartes] told Willy [Guillermo] that she was going to call the police because he was disrespecting his mother. Willy got upset and took off running inside of the house and locked it. She called 911 for help, and Maura called her daughter to calm Willy down. The police later showed up and tried to open the door, but it was locked. *The police asked Maura for permission, but she didn't want to let them in. She and Ana (the daughter-in-law to Maura) let the police talk to Willy, but Maura would only stay quiet. The police ended up going into the house.* She heard the police talking to Willy, but it was in English, which she didn't understand. After about 5 minutes, Maura's daughter showed up, and that's when she heard gunshots inside the house.

(*Id.*, Exh. 8) (emphasis added).

---

[10] The Deputies also rely on that portion of Ayala's deposition in which he testified to the same. (Dkt. No. 34, Exh. 1 at p. 175).

[11] For the first time in their surreply, Plaintiffs argue that Defendants provide no evidence that Maura owned the home, but the law requires only common control, not ownership, and the record establishes that she resided there with Guillermo. (Dkt. No. 39-2 at p. 6; Dkt. No. 41 at ¶ 2; Dkt. No. 37, Exhs. 6, 7; Dkt. No. 39, Exh. 13).

Plaintiffs also appeal to Ayala's body camera video, with audio beginning upon his arrival at the home, showing Maura and two other women present.  (*Id.* at p. 8; *see* Exh. 3).  The first portion of the video cited by Plaintiffs contains Ayala's initial encounter with Maura, with whom he speaks in Spanish, and the second portion encompasses the sounds of breaking glass followed by the Deputies' approach to the front door, during which Maura is seen standing against the fence line in front of the home and heard yelling to the Deputies.  (*Id.*, Exh. 3 at 1:10-1:25, 2:31-3:07).  Plaintiffs' response does not attempt to translate what Maura or Ayala said—they simply state that the body camera footage supports their position that Maura never gave consent.  The Deputies' reply, though, points the Court to the latter portion of the footage and offers a translation: they interpret Maura's voice to yell, "Abre la puerta!" to which Ayala responds, "Si!", then to yell, "Quibre la puerta!" to which Ayala again responds, "Si!"  (Dkt. No. 38 at ¶ 5; Dkt. No. 34, Exh. 4 at 2:52, 3:03).[12]  The Deputies point to Flores's body camera video and audio, also attached to Plaintiffs' response, as additional evidence reflecting the voice of Maura and another person yelling, "Abre la puerta!", then Maura yelling, "Quibre la puerta!" just prior to the Deputies' forced entry.  (Dkt. No. 38 at ¶ 5; Dkt. No. 37, Exh. 4 at 6:52, 7:04).  The Deputies ask the Court to take judicial notice of "(1) the fact that 'abre la puerta' in Spanish translates to 'open the door' in English; and (2) the fact that 'quibre la puerta' is Spanish that translates to 'break the door' in English."  (Dkt. No. 38 at ¶ 5).  In a surreply, Plaintiffs offer a certified transcript and Spanish-to-English translation of Ayala's initial encounter with Maura, during which he asks her for permission to force the door open and she responds that her daughter is on the way to talk to Guillermo, and that "[o]nce she talks to him maybe he'll open it for you.  Voluntarily."  (Dkt. No. 39, Exh. 13).  The transcript ends here; as to the second portion of the footage, Plaintiffs offer an affidavit from the translator attesting that she cannot clearly make out what is said since "people

---

[12]  Ayala's body camera video and audio are also attached to the Motion.  (Dkt. No. 34, Exh. 4).

are yelling over each other," except that she "can hear an unidentified female voice saying 'quiebre la puerta, oiga,' translated to 'hey, break the door open,' followed by the Deputy saying 'si,' translated to 'yes.'"  (*Id.*, Exh. 14).[13]

Regardless of whether, as the Deputies argue, Maura gave Ayala her implicit consent for the Deputies to enter the home once her daughter arrived, and that "they merely executed that consent in a more expedient manner," the record is undisputed that after the sounds of breaking glass are heard, a female voice yells, "break the door open."  (Dkt. No. 38 at ¶ 7).  That the translator's affidavit refers to the female voice as "unidentified," and that the witness affidavits attest that Maura never gave consent, do not place the consent issue in genuine dispute, for the following reasons.  First, the translator does not negate, and the Court also finds, that "abre la puerta"—judicially noticed as a command to "open the door"—can be heard in Ayala's and Flores's body camera audio prior to the other acknowledged command, "quiebre la puerta."  *See* (Dkt. No. 41 at ¶ 3).  Second, neither of the other two females present on the scene—presumably, those who provided the affidavits disavowing consent—identifies herself as the speaker.  (*Id.*). Both by inference and based on the Court's own review of the body camera video and audio, the speaker is Maura.  *See Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)) (even at summary judgment stage, court "need not rely on the plaintiff's description of the facts where [video evidence] discredits that description but should instead consider 'the facts in the light depicted by the videotape.'").  As someone with common control over the home in which Guillermo had barricaded himself, Maura had the authority to grant the Deputies consent to enter and did so once Guillermo broke the window,

---

[13]  The affidavit supplants an earlier-dated email from the translator, also attached to the surreply, in which she offers her initial, more informal interpretation of the same portion of the footage.  *See* (Dkt. No. 39, Exhs. 15, 16).

relieving them of the need to obtain a warrant and negating Plaintiffs' Fourth Amendment warrantless entry claim.

To the extent Plaintiffs complain of Guillermo's warrantless arrest, they do so in the context of arguing that Guillermo's supposed commission of the Class A misdemeanor offense of assault/family violence did not create exigent circumstances justifying warrantless entry for the purpose of arrest. *See* (Dkt. No. 37 at pp. 9-10). Although Maura's consent to entry obviates the need to consider the exigent circumstances exception to the warrant requirement, the Court acknowledges that any warrantless arrest must still "be based on probable cause, which exists 'when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense.'" *E.g.*, *Glenn v. City of Tyler*, 242 F.3d 307, 313 (5th Cir. 2001) (quoting *Spiller v. Texas City*, 130 F.3d 162, 165 (5th Cir. 1997)). Texas law gives peace officers the authority to "arrest, without warrant…persons who the peace officer has probable cause to believe have committed an offense involving family violence," defined as "an act by a member of a family or household against another member of the family or household that is intended to result in physical harm[.]" TEX. CODE CRIM. P. art. 14.03(a)(4), (f); TEX. FAM. CODE § 71.004(1); *see also* TEX. PENAL CODE § 22.01(a), (b) (defining Class A misdemeanor assault to include intentionally causing bodily injury); *Glenn*, 242 F.3d at 313 (in context of Fourth Amendment warrantless arrest claim, considering officer's probable cause to arrest under former art. 1403(a)(4) and § 22.01). To this end, Plaintiffs' response notes Flores's testimony that Guillermo was under arrest "[f]rom the moment [the Deputies] arrived and [they] had the victim and witness corroborating the story that [Guillermo] had committed a crime against his mother," and consistent with both Deputies' testimony, Plaintiffs themselves provide Ms. Turrubiartes's statement that she called 911 after seeing Guillermo punch his mother in the face. *See* (Dkt. No. 34, Exh. 1 at pp. 53, 57-59; Exh. 5

at pp. 17, 24-26, 73-74, 82, 122; Dkt. No. 37 at p. 7 n.3, Exh. 8).  The Court thus rejects Plaintiffs' suggestion, made for the first time in their surreply, that the Deputies lacked probable cause to arrest because no evidence exists that Maura sustained any injury, or if she did, that Guillermo caused it.  *See* (Dkt. No. 39-2 at pp. 5-6).[14]  The record supplies evidence of both, establishing facts and circumstances sufficient to allow a reasonable officer arriving on the scene to conclude that Guillermo had committed an arrestable offense.  Plaintiffs have no Fourth Amendment claim for warrantless arrest.

### 3.    Excessive Force

Plaintiffs' final claim against the Deputies invokes the Fourth Amendment's guarantee of a citizen's right to be secure in his person against unreasonable seizures, and therefore free from the use of excessive force in the course of arrest.  *Graham v. Connor*, 490 U.S. 386, 394 (1989); (Dkt. No. 1-21 at § V(E), (F)).  To establish an excessive force claim, a plaintiff must show (1) an injury (2) resulting from the use of force that was clearly excessive to the need, (3) the excessiveness of which was objectively unreasonable.  *E.g.*, *Ramirez v. Martinez*, 716 F.3d 369, 377 (5th Cir. 2013).  The latter two prongs, which are "often intertwined," *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012), require consideration of the totality of the circumstances, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight (the '*Graham* factors')."  *Ramirez*, 716 F.3d at 377 (quoting *Graham*, 490 U.S. at 396).  "The 'reasonableness' of a particular use of force must be judged from

---

[14]  Plaintiffs submit that the body camera videos show no injury to Maura, but Maura is seen describing an injury to her face when speaking to Flores upon his arrival. (Dkt. No. 39-2 at pp. 5-6; *see* Dkt. No. 37, Exh. 4).  Plaintiffs also cite to Ayala's statement to emphasize that the 911 call was classified as a welfare check, and that it was made because a neighbor saw Guillermo and Maura "arguing" in the front yard, but again, Ayala's statement also reports visible injuries to Maura's face, which he describes as "redness and slight swelling to the mouth area," and the neighbor's statement reports seeing Guillermo punch his mother in the face. (Dkt. No. 39-2 at p. 6; *see* Dkt. No. 34, Exh. 2; Dkt. No. 37, Exh. 8).

the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and with the acknowledgment that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. The ultimate question is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. Recently, the U.S. Supreme Court overruled the Fifth Circuit's use of a narrowed, "moment-of-threat" test when evaluating the reasonableness of a police shooting, holding that in these cases, too, "courts must consider all relevant circumstances, including facts and events leading up to the climactic moment." *Barnes v. Felix*, --- S.Ct. ---, 2025 WL 1401083, at *2 (May 15, 2025). *Barnes* does not alter precedent establishing the use of deadly force as constitutional "when the suspect poses a threat of serious physical harm to the officer or others." *Elizondo v. Green*, 671 F.3d 506, 510 (5th Cir. 2012) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

Drawing from their depositions, Ayala's deposition exhibits consisting of his written statement and a photograph of the subject knife, and Ayala's body camera footage, including a slow-motion video of the seconds surrounding the shooting and a still image taken from that video,[15] the Deputies characterize the totality of circumstances they faced as follows:

- Based on Maura's statements to Flores upon his arrival, the Deputies were aware that Guillermo suffered from mental illness for which he was taking no medication;[16]
- Based on Maura's statements and visible injuries, the Deputies were aware that Guillermo had just assaulted his elderly mother by punching her in the face;[17]
- Guillermo was "highly agitated" and causing damage to the home;

---

[15] Ayala and defense counsel provide affidavits authenticating these exhibits. (Dkt. No. 34, Exhs. 3, 6).

[16] *See* (Dkt. No. 34, Exh. 1 at pp. 149, 141; Exh. 5 at pp. 21, 26, 75).

[17] *See* (*id.*, Exh. 1 at pp. 53, 57, 59; Exh. 5 at pp. 17, 24-26).

- Upon entering the home, the Deputies repeatedly yelled Guillermo's name, repeatedly announced they were law enforcement, and repeatedly ordered Guillermo to come out of the bedroom with his hands up;[18]
- The Deputies loudly instructed Guillermo, who was holding a knife, not to approach them as he got up from a seated position to shut his bedroom door;[19]
- The Deputies loudly and repeatedly ordered Guillermo to drop his knife, which had a 10-inch blade, and come out of the bedroom with his hands up;[20]
- After Ayala nudged the bedroom door open, Guillermo approached the doorframe a second time, raised the knife still in his hand and pointed it at the Deputies, screamed at them to get out of his house, and closed his bedroom door;[21]
- As this occurred, the Deputies pleaded with Guillermo to put the knife down, not to approach them, and to talk things over with them;[22]
- Though Guillermo called them "pigs" and expressed his refusal to talk to them, the Deputies continued to plead with him to put down his knife and speak with them while also telling him they did not want to hurt him;[23]
- "[I]n a split second," Guillermo opened his bedroom door and walked past the doorframe towards the Deputies while holding the knife with its blade facing forward;[24] and
- "[H]aving a split second to react" to Guillermo's approach, the Deputies—who were "only a few feet away"—discharged their firearms and shot Guillermo in quick succession until he let go of the knife.[25]

(Dkt. No. 34 at ¶ 19). In summary, by the time they fired their weapons, the Deputies had collectively: (1) identified themselves four times as law enforcement; (2) ordered Guillermo eleven times to drop his knife; (3) ordered Guillermo three times to come out of his bedroom with his hands up; (4) ordered Guillermo twice not to come near them; and (5) expressed their desire to talk with Guillermo at least six times. (*Id.*).[26] They submit that, given all the factual circumstances, this case aligns with controlling precedent holding that the defendant officers acted with objective reasonableness when employing deadly force. (Dkt. No. 34 at ¶ 20); *see Elizondo*, 671 F.3d at 510 (officer acted reasonably when he shot suicidal suspect three times after suspect failed to comply with commands to drop his knife, moved closer to officer, and raised knife in threatening

---

[18] *See* (*id.*, Exh. 4).
[19] *See* (*id.*).
[20] *See* (*id.*, Exh. 2 at p. 4; Exh. 4).
[21] *See* (*id.*, Exh. 4).
[22] *See* (*id.*).
[23] *See* (*id.*).
[24] *See* (*id.*, Exh. 1 at pp. 93, 95, 116-18, 158; Exhs. 4, 7, 8).
[25] *See* (*id.*, Exh. 1 at pp. 119-20; Exhs. 2, 4).
[26] *See* (*id.*, Exh. 4).

motion); *Rockwell*, 664 F.3d at 991-92 (it was objectively reasonable for officers to shoot suspect who carried two knives and charged in direction of one or more officers);[27] *Mace v. City of Palestine*, 33 F.3d 621, 624-25 (5th Cir. 2003) (objective reasonableness test satisfied where officer shot intoxicated suspect who brandished a sword, failed to respond to officers' directives to drop weapon, and raised weapon at officers from approximately eight to ten feet away).

Aside from noting that the Deputies never told Guillermo he was under arrest—instead, they "repeatedly told [Guillermo] that they wanted him to come out of the bedroom and talk to them"—Plaintiffs' response focuses on the seconds before the shooting, citing to the Deputies' and responding crime scene specialist's depositions, Ayala's body camera footage, Plaintiffs' own still images taken from the Deputies' footage, and the autopsy report, to represent the totality of the circumstances as follows:

- At the time Guillermo was shot, he was coming out of his bedroom as the Deputies had previously asked him to do;
- Neither Deputy gave Guillermo a command—to stop advancing, drop the knife, or otherwise—within 10 seconds of opening fire (Ayala said only, "Hey");[28]
- At the time Guillermo was shot, he was passing through the threshold of his bedroom door while holding a black-handled kitchen knife at his side, pointed down;[29]
- Guillermo was moving out of the bedroom "at a walking pace" and was "not charging at [the Deputies], acting in an aggressive manner, or confronting them";[30]
- Both Deputies were wearing body armor or bullet-proof vests and were armed with Tasers, batons, and pepper spray;[31]
- Ayala discharged his weapon seven times and Flores began discharging his weapon— which he did four times—after Ayala fired the first shot, both aiming for center mass;[32]

---

[27] The Supreme Court's recent decision in *Barnes*, *supra*, abrogated *Rockwell* insofar as the latter followed precedent requiring a focus on the moment of the threat in assessing reasonableness, but as to the context in which it did so—when declining the plaintiffs' invitation to "examine the circumstances surrounding the forced entry, *which may have led to the fatal shooting*, in evaluating the reasonableness of the officers' use of force," *Barnes* specifically refrained from deciding "whether or how an officer's own 'creation of a dangerous situation' factors into the reasonableness analysis." *Barnes*, 2025 WL 1401083, at *5 (emphasis added). On its assessment of whether the officers' use of force was objectively reasonable, *Rockwell* did not cabin its analysis to the moment of the threat and is still good law.

[28] *See* (Dkt. No. 37, Exh. 3).

[29] *See* (Dkt. No. 34, Exh. 1 at p. 93; Exh. 5 at pp. 51, 102; Dkt. No. 37, Exhs. 3, 11; Exh. 12 at pp. 26, 34).

[30] *See* (Dkt. No. 37, Exh. 3).

[31] *See* (Dkt. No. 34, Exh. 1 at pp. 85-86; Exh. 5 at p. 66).

[32] *See* (*id.*, Exh. 1 at p. 84; Exh. 5 at pp. 44-46).

- Ayala testified that he was about ten feet away from Guillermo when he discharged his weapon, and Flores testified that he was roughly eight to ten feet away from Guillermo when he fired;[33]
- Guillermo had three entry wounds to the back (one to the mid-to-lower back and two to the buttocks);[34] and
- Flores placed handcuffs on Guillermo after he had been shot eleven times, not knowing whether Guillermo was still a threat.[35]

(Dkt. No. 37 at pp. 16-21; Dkt. No. 39-2 at p. 9). Plaintiffs equate their version of the circumstances faced by the Deputies to those at issue in other deadly force cases in which the Fifth Circuit declined to find a Fourth Amendment violation established by the record. (Dkt. No. 37 at pp. 17-18); *Reyes v. Bridgewater*, 362 F. App'x 403, 407 (5th Cir. Jan. 22, 2010) (summary judgment reversed in light of evidence that suspect "stood, in his own home, with a kitchen knife at his side, swaying slightly from side to side, at a safe distance away…when [officer] opened fire," and officer "was responding to a 911 call reporting a 'domestic disturbance with possible violence'" and "was not anticipating making a felony arrest, or even necessarily any arrest at all"); *Bacque v. Leger*, 201 F. App'x 374, 376 (5th Cir. Nov. 9, 2006) (evidence that officer shot suspect who "stood motionless with his knife at his side" at least 10 to 40 feet away from officer, "and had ceased to menace anyone," precluded summary judgment); *Amador v. Vasquez*, 961 F.3d 721, 729-30 (5th Cir. 2020) (denial of summary judgment appropriate given evidence that officers shot suspect who "had a knife, not a gun," "was several feet away from the officers," "had his hands in the air in a surrender position," and "stood stationary in the officers' line of sight").

Given the existence of video and audio capturing the Deputies' encounter with Guillermo, the parties' competing recitations of the evidence differ less on the facts themselves than on which of those facts to highlight and how to interpret them in assessing the totality of the circumstances. In addressing the parties' disagreements, the Court views the facts "in the light depicted by the

---

[33] *See* (*id.*, Exh. 1 at pp. 92-93; Exh. 5 at p. 15, 109).
[34] *See* (Dkt. No. 37, Exh. 5; Exh. 12 at pp. 23-24).
[35] *See* (Dkt. No. 34, Exh. 5 at pp. 88-89).

videotape." *Carnaby*, 636 F.3d at 187.  Plaintiffs submit that Guillermo was simply complying with the Deputies' commands to come out his room when he was shot, but they fail to acknowledge—as the body camera footage confirms—that the Deputies repeatedly told Guillermo to come out with his hands up, and to drop the knife; he was, therefore, non-compliant as he approached them holding the knife.  *See* (Dkt. No. 37 at p. 16; Dkt. No. 38 at ¶ 14).  How he held the knife, and the manner of Guillermo's approach, are also subjects of dispute, but Ayala's video reveals that the still image offered by the Deputies, showing Guillermo's left arm bent at the elbow with the knife pointing towards Ayala, precedes in time—by a fraction of a second—Plaintiffs' images showing Guillermo's arm at his side with the knife pointing down and Ayala's first shot, all of which occurred in rapid succession.  *See* (Dkt. No. 34, Exhs. 4, 7, 8; Dkt. No. 37, Exhs. 3, 4, 11).  The order of the images indicates, consistent with the video, that Guillermo's arm was moving in the typical motion of one walking, albeit at more than a leisurely pace.  Plaintiffs also take issue with the Deputies' use of the term "split-second" to describe the time in which the Deputies had to react, but Ayala's body camera footage reflects that in the seconds before Guillermo emerged from the room, Ayala's only view of Guillermo—still holding the knife—was through the hole created by the missing doorknob of the closed door.  *See* (Dkt. No. 34, Exh. 4; Dkt. No. 37 at pp. 19-20, Exh. 10).  Flores, meanwhile, had walked into the kitchen, which shared a wall and window with Guillermo's bedroom.  *See* (Dkt. No. 34, Exh. 4; Dkt. No. 37, Exhs. 4, 10).  The Deputies first voiced that they saw Guillermo getting up from his chair around the 7:09 minute mark of Ayala's video, Guillermo had opened the door and started moving towards Ayala, knife in hand, by the 7:12 mark, and the shots—from Ayala standing about ten feet in front of Guillermo, and from Flores at approximately the same distance, after emerging from the kitchen and facing Guillermo's left side, began around the 7:13 mark and had ended by the 7:16 mark.  (*Id.*).  Leading up to the climactic moment, the Deputies had gathered facts giving them probable cause to believe

that Guillermo had assaulted his elderly mother by punching her in the face, and it is undisputed that they forced entry into the home after hearing Guillermo's window shatter from the inside-out and encountered Guillermo in his bedroom holding the knife, which he refused to drop despite multiple commands to do so, and at one point raised in the air. After raising the knife and yelling at the Deputies to get out, Guillermo shut the door and did not emerge until the fateful final seconds of the incident.

Plaintiffs complain of the Deputies' deliberate choice to use deadly force when they had non-lethal means (i.e., Tasers, batons, and pepper spray) at their disposal. (Dkt. No. 37 at p. 17). But again, courts may not employ "the 20/20 vision of hindsight" in judging objective reasonableness, and the Fifth Circuit has cautioned against accepting the "alternative means" argument as dispositive of the reasonableness inquiry:

> [T]he magistrate judge improperly criticized Knoulton's failure to consider the use of non-lethal force or to employ a crisis negotiator. A creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or pursue it. Even where an officer acts negligently and contrary to police procedure, this court has failed to recognize a constitutional claim where a police officer used deadly force in response to a reasonable belief that an individual posed a threat of serious harm.

(Dkt. No. 38 at ¶ 20); *Ramirez v. Knoulton*, 542 F.3d 124, 129-30 (5th Cir. 2008) (quoting *United States v. Sharpe*, 470 U.S. 675, 686-87 (1985); *Young v. City of Killeen*, 775 F.2d 1349, 1350-53 (5th Cir. 1985)) (internal citations and quotation marks omitted). Of the Fifth Circuit cases on which the Motion relies to argue that Guillermo posed such a threat, Plaintiffs' response takes on what is, arguably, the least analogous: *Mace*, which involved an intoxicated suspect's repeated, threatening motions with a much larger weapon—a sword—which he had "raised…toward the officers" when their chief of police fired a single shot to the suspect's arm, causing him to drop it.

18 / 22

(Dkt. No. 37 at p. 20); *Mace* 333 F.3d at 622-23.[36]  But *Mace* is analogous in other respects; Guillermo may not have been intoxicated, but he was, like the suspect in *Mace*, "uncooperative" and at the very least, "agitated."  *Mace*, 333 F.3d at 624-25.  He was also, according to the Deputies' testimony and consistent with the video, eight to ten feet away from the officers when shot—a distance Plaintiffs characterize as "safe," but the Fifth Circuit in *Mace* did not, since the incident there "took place in the close quarters of a mobile home park, which limited the officers' ability to retreat[.]" (Dkt. No. 37 at p. 16; Dkt. No. 38 at ¶ 17); *Mace*, 333 F.3d at 624-25.  Plaintiffs submit that the Deputies "could have retreated," but the interior of a home constitutes even closer quarters than a mobile home park and offers similarly limited options for retreat.  (Dkt. No. 37 at p. 17).  Another case cited by the Deputies in their reply, *Shepherd v. City of Shreveport*, 920 F.3d 278 (5th Cir. 2019), involved the same distance between the defendant officer and a knife-wielding suspect at the time the officer fired his weapon, and elicited from the Fifth Circuit the following criticism of the plaintiffs' position that a knife, even if by the suspect's side rather than raised, "could not be a sufficient threat even at ten feet":

> Counsel cites no authority for this assertion; counsel simply proclaims it as if it is a fact.  But it is not a fact.  Furthermore, it disregards the actual fact that Mr. Shepherd was continuing to move toward Corporal Tucker even after having a shotgun pointed at him.  Counsel's unsupported assertion that holding a knife could not pose a threat of serious bodily injury under the facts of this case is not sufficient to create a genuine issue of material fact.

*Shepherd*, 920 F.3d at 284.  That Guillermo, like Mr. Shepherd—who had similarly ignored various commands issued by the officer—was moving towards Ayala, knife in hand, at the time the Deputies discharged their weapons from the same distance (and in closer quarters than a driveway, where the incident in *Shepherd* occurred), suggests the same result: that the Deputies'

---

[36] Plaintiffs do not attempt to distinguish the Deputies' other cited authorities, *Elizondo* or *Rockwell*.

use of deadly force "was neither excessive nor unreasonable under the Fourth Amendment." *Id.* at 285.

Plaintiffs nonetheless maintain that Guillermo could not have posed a threat necessitating the *number* of shots fired by pointing to the autopsy report and supporting testimonial evidence reflecting entry wounds to his back, citing two additional Fifth Circuit cases in support. (Dkt. No. 37 at pp. 18-19); *Baker v. Putnal*, 75 F.3d 190, 198 (5th Cir. 1996) (where medical examiner's report indicated that suspect was not facing officer when shot, "[t]he number of shots and the nature of the wounds raise a serious question as to the reasonableness of [the officer's] conduct, more of a question of fact than a court may dispose of on summary judgment"); *Graves v. Zachary*, 277 F. App'x 344, 346, 348-49 (5th Cir. Apr. 30, 2008) (where suspect holding gun never threatened officers or moved aggressively, and given evidence that he slumped over after being shot once in the groin, record created genuine material issue as to whether officer violated suspect's constitutional rights by shooting him in chest after he was already incapacitated).[37] Here, though, Guillermo was facing Ayala when first shot, and again, all of the shots occurred in rapid succession within the span of a few seconds; the last was not, as in *Graves*, after a pause or to the chest. *See* (Dkt. No. 38 at ¶ 24); *Graves*, 277 F. App'x at 346, 348. Moreover, as the Deputies observe, binding precedent forecloses the argument "that the sheer number of shots render[s] the force excessive." (Dkt. No. 38 at ¶ 23); *Garza v. Briones*, 943 F.3d 740, 748 (5th Cir. 2019) (citing *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014)). "[I]f police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Id.* (quoting same). Here, as in *Garza*, the video reflects that "Defendants stopped firing when [the suspect] fell to the ground," at which point the immediate threat had

---

[37] Plaintiffs also repeat their citation to *Amador*, but this case does not identify the number of shots fired and is inapposite in other respects; Guillermo did not, like the suspect in *Amador*, hold up his hands in a surrender position and remain stationary before he was shot. (Dkt. No. 37 at p. 19); *see* (Dkt. No. 38 at ¶ 24); *Amador*, 961 F.3d at 729-30.

20 / 22

ended; that the Deputies fired eleven shots in the span of a few seconds—far less, and in less time, than the 61 shots fired in eight seconds in *Garza*—"does not render their use of force objectively unreasonable." *Garza*, 943 F.3d at 748.

Plaintiffs make one final challenge to the use of force employed by Flores, insofar as this Defendant placed handcuffs on Guillermo after the Deputies shot him eleven times. (Dkt. No. 37 at p. 17). As the Deputies observe, though, the Fifth Circuit "has frequently found the use of handcuffs to be a *de minimis* use of force," and since Plaintiffs present no evidence that Guillermo sustained injury from being handcuffed, Plaintiffs have no cognizable excessive force claim predicated on this theory. (Dkt. No. 38 at ¶ 28); *Johnson v. Hollins*, 716 F. App'x 248, 253 (5th Cir. Dec. 1, 2017); *see also Solis v. Serrett*, 31 F.4th 975, 981 (5th Cir. 2022) ("Generally, to maintain a claim for excessive force, a plaintiff need not demonstrate a significant injury, but the injury must be more than *de minimis*.").

In sum, the facts and events faced by the Deputies most resemble those at issue in their cited precedent: an aggressive and non-compliant individual, armed with a knife that he refused to put down even after multiple commands to do so, at one point raised in the air, and in the final climactic moments continued to hold—not while standing, motionless, in a posture of surrender, or at a safe distance, as in Plaintiffs' cited cases—but moving towards Ayala while the Deputies stood eight to ten feet away, within the confines of a home. What the Deputies could have done differently from the moment of their arrival is a matter of speculation, best employed to shape future policy and training; what they did do, under Fifth Circuit precedent, amounted to the objectively reasonable use of deadly force. No constitutional violation occurred, and the Deputies are entitled to qualified immunity on the Fourth Amendment claims against them.

## C.   Municipal Liability Claim

In moving for summary judgment on Plaintiffs' § 1983 "municipal liability" claim against the Deputies in their official capacities/the County, *see* (Dkt. No. 1-21 at § V(D)), the Motion cites to long-established precedent setting forth the three elements necessary to hold a municipality or other governmental unit, such as the County, liable under § 1983: "a policymaker; an official policy; and *a violation of constitutional rights* whose moving force is the policy or custom." (Dkt. No. 34 at ¶ 26); *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 866 (5th Cir. 2012) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)) (internal quotation marks omitted) (emphasis added).   The Motion submits that, "upon finding that [Guillermo] did not suffer any deprivation of his constitutional rights at the hands of Ayala and Flores, the Court must also find that Plaintiffs' § 1983 claims against the County fail," and the Court agrees.  (Dkt. No. 34 at ¶ 26-27); *see*, *e.g.*, *Doe*, 675 F.3d at 866-67 ("We have stated time and again that '[w]ithout an underlying constitutional violation, an essential element of municipal liability is missing.'") (quoting *Becerra v. Asher*, 105 F.3d 1042, 1048 (5th Cir. 1997)).  Even if County policy served as the moving force behind the asserted injuries, "there can be no § 1983 liability [without] a constitutional violation," *Doe*, 675 F.3d at 867, and summary judgment must be granted.

## V.   Conclusion

For the foregoing reasons, the Court hereby **ORDERS** that Defendants' Motion for Final Summary Judgment is **GRANTED**.

SO ORDERED June 30, 2025, at McAllen, Texas.

_____
Randy Crane
Chief United States District Judge

22 / 22